LIVERMORE FALLS TRUST AND BANKING COMPANY

*vs.*

RICHMOND MANUFACTURING COMPANY et als.

SAME *vs.* SAME.

SAME *vs.* SAME.

WALDO PETTENGILL et als., in Equity,

*vs.*

LIVERMORE FALLS TRUST AND BANKING COMPANY et al.

Androscoggin.    Opinion May 9, 1911.

*Chattel Mortgages. Intent to Take Possession. Notice. Book Accounts. Mortgagee in Possession. Prior Incumbrances. Foreclosure. Application of Proceeds. Debts Secured by Mortgage. Principal and Surety. Reference. Law Court. Duties. Accounting.*

1. The mortgagee in a chattel mortgage of the plant, tools, stock, etc., of a going manufacturing concern is not required by the law to give notice of its intention to take possession of the mortgaged property for breach of condition.

2. Such a mortgagee upon taking possession of the mortgaged property is not required by the law to assume, perform or complete then existing contracts of manufacture made by the mortgagor, however profitable they may be.

3. Though choses in action, like book accounts, are included in a chattel mortgage they are not thereby made subject to the statutes governing chattel mortgages. As to them the mortgage only operates as a pledge or equitable assignment, and the title to them does not become absolute in the mortgagee by a statutory foreclosure of the mortgage. He is not required by the law to collect them and is accountable only for what he actually receives on them so long as he does not acquire an absolute title.

4. A mortgagee is not required by the law to pay off prior mortgages, or existing liens, nor to perform conditions necessary to secure or perfect the title to any of the mortgaged property, even though the property is lost through the omission to do so.

5.  Where a mortgage secures several debts due from the mortgagor to the mortgagee, and the mortgaged property is not sufficient to pay all the debts, the mortgagee upon foreclosure may elect to which of the debts the property shall be applied.

6.  In such case the bringing suit on some of the debts is an election to apply the mortgaged property to the other debts not put in suit.

7.  Where some of the debts secured by a mortgage are also secured by sureties, the latter cannot require the application of the mortgaged property to such debts in preference to those debts secured only by the mortgage.

8.  The sureties upon debts also secured by a mortgage cannot require the creditor to foreclose the mortgage upon condition broken, nor, to follow up the foreclosure if begun. The creditor may without their consent allow the debtor more than the statutory time for redemption after foreclosure is begun ; and in such case he will be held to account only for the value of the property at the end of the extended time.

9.  The Law Court will not act, at least in the first instance, as auditor, master in chancery, or accountant. It was not established for such purposes.

On report.    Remitted to nisi prius for further proceedings.

The three first named cases were actions at law on certain promissory notes, while the last named case was a bill in equity brought by the sureties on the notes sued in the actions at law, against the plaintiff in the actions at law and the Richmond Manufacturing Company, praying for an injunction against the suits on the notes and for an accounting by the plaintiff in the actions at law, which had taken possession of certain personal property under and by virtue of certain chattel mortgages given to it by the Richmond Manufacturing Company, and instituted foreclosure proceedings thereon. The general issue with a brief statement of special matter of defense was filed in each of the actions at law, and an answer with a demurrer therein inserted was filed by the Livermore Falls Trust and Banking Company in the equity suit. The four cases were tried together and at the conclusion of the testimony were reported to the Law Court for determination.

The facts, so far as material, are stated in the opinion.

*Frank W. Butler*, and *Heath & Andrews*, for Livermore Falls Trust and Banking Co.

*Bisbee & Parker*, and *Newell & Skelton*, for defendants in actions at law and plaintiffs in equity suit.

SITTING :    EMERY, C. J., WHITEHOUSE, SAVAGE, SPEAR, KING, BIRD, JJ.

EMERY, C. J.    From the evidence we find certain material facts to be as hereinafter stated :—

May 5, 1909, the Livermore Falls Trust and Banking Company (hereinafter called the bank) held various promissory notes of the Richmond Manufacturing Company (a corporation engaged in the manufacture of wood novelties and hereinafter called the company) as follows :—

A group of five notes aggregating $25000 dated Feby. 1, 1905 secured by a chattel mortgage, in the usual form, of all its tangible personal property, mills, machinery, tools, unmanufactured stock, manufactured goods, etc., etc. ; a group of nine notes aggregating $26000 and of various dates between February, 1905, and July, 1906, secured by a second chattel mortgage covering the same property, but made subject to the prior mortgage of Feby. 1, 1905 ; and a group of notes dated subsequent to 1906.    Nov. 8, 1908, the company gave the bank a third mortgage of all its tangible personal property, and also of all its then existing book accounts, and such accounts as it should acquire from the sale of any of the personal property.    The second and third mortgages were conditioned for the payment of all sums that were then or might thereafter be due the bank from the company.    The second group of notes, the nine dated between February, 1905, and July, 1906, were signed by various individuals, in form as co-promissors, but really as sureties, as was known to the bank.

The foregoing notes were all unpaid and overdue May 5, 1909, on which day the bank, without giving any notice of its intention, took possession of all the property covered by either of the three chattel mortgages, and on the 15th of the same month began due statutory proceedings for foreclosure of all of them.    In the meantime, however, on the 10th of the same month, May, 1909, the bank began actions at law against all the parties on the nine notes signed by the individual sureties and secured by the second and third mortgages.    Pending these actions the sureties brought a bill

in equity against the bank alleging that the value of the mortgaged property taken by the bank was enough to pay all the indebtedness of the company to the bank, or would have been if properly cared for and managed by the bank after possession taken ; and praying for an accounting by the bank and for an injunction against the suits on the notes.    All the suits including that in equity were reported to the Law Court for decision upon the pleadings and evidence.

There was no redemption of the mortgaged property and the title of the bank to all the tangible property subject to any of the mortgages became absolute through completed foreclosure at least as early as Nov. 3, 1909.   The main question, therefore, is, how much credit for the mortgaged property the bank must allow upon the indebtedness to it of the company secured by the mortgages, or, more immediately, what credit therefor must be allowed on the nine notes in suit signed by the individual sureties.   The amount of such credit, however, will be affected by the solution of several subsidiary questions which are now to be considered.

1.    At the time the bank took possession of the mortgaged property, the company had on hand a large amount of unmanufactured stock and also had contracts for the manufacture and shipment of wood novelties, etc.   The sureties claim that these contracts, or some of them, were profitable for the company and were such as the bank should have completed, but did not, and hence the bank should be debited with the profit it would have thus made.   They also claim that by taking possession of the property, shutting down the mills, etc., the bank caused great depreciation in the value of the property, and that it should be debited with this depreciation.

Without considering other answers to these claims, it is a sufficient answer that the bank, even as mortgagee in possession, was under no legal obligation to carry on the business of the mortgagor. Granting that by taking possession of the mortgaged property, the bank stopped a going concern, prevented the company and the sureties from fulfilling profitable contracts, and generally reduced the market value of the plant, it nevertheless was within its rights

VOL. CVIII 14

as mortgagee. It had given it the right to take the mortgaged property into its own possession upon the failure of the company and the sureties to comply with the conditions of the mortgages, but it did not have imposed upon it the duty of assuming the burden and risk of carrying on the business for their benefit. If it became trustee, it was for conservation, not for operation. The company and the sureties could have prevented such taking possession and all the consequences complained of by paying the indebtedness secured by the mortgages. To their failure to do so must be attributed the loss sustained.

There is no evidence that the mills, machinery, etc., could have been leased, and hence we do not find that the bank should be debited anything for rents and profits.

2. When the bank took possession of the mortgaged property, it also took possession of the books of the company containing their accounts for merchandise sold, etc. Some of these accounts the bank collected in whole or in part, but did not collect them all, nor did it put any of the uncollected accounts in suit or use other means to enforce payment except by solicitation, etc. What accounts it did not collect it turned over with the books to the trustee in bankruptcy upon his appointment in September following. The sureties now claim that the bank must be debited with the value of those accounts whether collected or not, such value to be fixed by the court from the evidence, as in the case of tangible personal property.

The answer to this claim is that choses in action, such as book accounts, are not within the law governing chattel mortgages. That law applies only to goods and chattels capable of manual delivery. *Emmons* v. *Bradley*, 56 Maine, 333; *Emerson* v. *E. & N. A. Ry.*, 67 Maine, 387; *Marsh* v. *Woodbury*, 1 Met. 436; *McKie* v. *Gregory*, 175 Mass. 505. The inclusion of book accounts in a mortgage of goods and chattels simply operates as a pledge or an equitable assignment of them. The mortgagee does not acquire absolute title to them by a statutory foreclosure of the mortgage as a chattel mortgage. To acquire such title he must have them sold as a pledge or under equity proceedings. It follows that the mort-

gagee is not obliged to give credit for their value upon completion of foreclosure of the chattel mortgage, but only for what he collects of them. *Emmons* v. *Bradley*, 56 Maine, 333 ; *McKie* v. *Gregory*, 175 Mass. 505. He may proceed with the collection until the indebtedness secured by the assignment is fully paid, but when that is paid the remaining accounts belong to the assignor, as also do any proceeds of collection in excess of the indebtedness. There is no forfeiture as in the case of tangible property under a foreclosed chattel mortgage.

Of course the assignee must not release any of the debtors in such accounts, nor impair any security given for them, but by simply accepting the assignment he does not assume the duty to collect, nor the obligation to incur the expense of suits and the risk of insolvency of the debtors, of counter claims, of uncredited payments, of claims for recoupment, etc., etc. The assignor or his sureties can resume the right to collect on their own account at any time, at least before sale, by paying the indebtedness to secure which the assignment was made.

3. At the time of the bank's taking possession of the mortgaged property, the company had a stumpage permit on timber lands, to preserve which it was obliged to take off a fixed amount of stumpage each year and make payments at fixed dates. The written permit was in the custody of the bank, but the bank did nothing toward complying with the conditions necessary to prevent forfeiture, whereupon the land owner cancelled it. The sureties claim that this permit was a very valuable asset of the company which the bank should have preserved, and not having done so is bound to give credit for its value.

It is quite questionable whether the permit was included in any of the mortgages, but at any rate there was no provision in any of them that the bank was to assume the performance of its conditions. In the absence of such a provision, a mortgagee or pledgee is not bound to pay off any liens, or prior incumbrances, or perform any conditions necessary to perfect title or save from forfeiture. He may do so for his own protection and have credit for what is necessarily paid for such purpose, but he may decline to do so and

let the property be taken under the superior title.   Here again, the company or the sureties could have  preserved this and all the other assets of the company by paying the indebtedness for which they were mortgaged or pledged.   Not having done so they cannot now have credit for it.

4.   It is not questioned that the first group of notes, the five dated Feb. 1, 1905, and secured by the first mortgage, are to be paid in full out of the mortgaged property before anything can be credited on the second group, (the nine notes signed by the sureties), since these latter notes are of later date and the mortgage to secure them was expressly made subject to the mortgage securing the first group.   A question is raised, however, as to whether any surplus after paying the first group in full is to be applied to the next indebtedness in order of date viz, the nine notes signed by the sureties, or may be applied by the bank to the still later notes secured by the last mortgage but not signed by the sureties, leaving for the nine notes only the balance, if any.

The rule that a debtor in making payments may designate to what debts they shall be credited, only applies to voluntary payments.   Further, in this case the company, the principal debtor and mortgagor, gave no direction as to how the value of the mortgaged property, or its proceeds should be applied, even supposing it could do so.   The bank, therefore, as between itself and the company, could elect to apply the surplus, if any, to the mortgage indebtedness of a later date than that for which the sureties were liable.   It did so elect by bringing suits on the notes signed by the sureties, and none on any other indebtedness secured by the mortgages.   *Starrett* v. *Barber*, 20 Maine, 457 ; *Berry* v. *Pullen*, 69 Maine, 101 ;  *Thorn* v. *Pinkham*, 84 Maine, 101.

The sureties certainly had no greater rights than their principal as to the application of the mortgaged property and proceeds.   A surety has the same right as the principal to pay before foreclosure completed all the indebtedness secured by the mortgages, and thereupon he has the right to have delivered to him, instead of the principal, the mortgaged property and its proceeds to the extent of the amount thus paid.   But "such previous payment by the surety is

alike essential where there is only one debt and one surety and where there are many debts all of which are equally protected and secured by the property mortgaged, and many several sureties for the several debts; for the chief and primary object of a pledge, or mortgage, to a creditor is his benefit, protection and advantage in reference to each and all of the several debts which it was made or given to secure. And until this object is fully accomplished, no surety can justly or lawfully interfere to disturb him in the possession of the property pledged, or hinder him from appropriating the proceeds of it toward payment of any such debt which he cannot otherwise collect or render available. And if there be one or more debts thus secured for which the debtor is alone responsible, and the amount of which cannot be obtained from on account of his insolvency or pecuniary inability, such proceeds may be applied, so far as necessary for that purpose, to the payment and discharge of such debts, and to that extent the sureties upon notes constituting other debts, can have no interest or right in the mortgaged property." *Wilcox* v. *Fairhaven Bank*, 7 Allen, 270, at page 272. In considering the claim of a surety to have the proceeds of mortgaged property applied pro rata to the debt for which he was surety, the Supreme Court of Connecticut said, "What are his (the surety's) peculiar equities that he should claim to direct the application of payments made and received by other parties? The creditor and debtor had the sole right of controlling those payments; and if neither have done this the court must do it as the rights, equities and intentions of the parties seem to demand. The defendant is an indorser, or, at most, a surety; and this constitutes his only relationship to these debts. It has been said that sureties are to be favored in the construction and enforcement of contracts. But we cannot extend such considerations to cases like the present. To do this would be to defeat the object and end of suretyship; it would be to hold that the surety might have the money paid by his principal so applied as to leave the creditor a loser notwithstanding his care and vigilance. This would be inequitable; and we cannot direct the application of this money upon this principle. Indeed this is a case in which, if the creditor had made no application of

the payment, the court upon equitable principles, would apply it upon the precarious debts." *Stamford Bank* v. *Benedict,* 15 Conn. 437, at page 445.

In accordance with the principles above stated, the sureties can have applied to the notes signed by them, only the surplus, if any, after the payment of all the other indebtedness of the company covered by the mortgages.

5. The statutory sixty days time for redemption from the foreclosure began to run May 15, 1909, but before its expiration, the company having been put into bankruptcy, the bank through its attorney without the consent of, or consultation with, the sureties, orally agreed, first with the receiver and then with the trustee in bankruptcy of the company, to extend the time for redemption to Nov. 3, 1909. There was no consideration for this extension, but it was granted at the request of the receiver and trustee to give them time to examine the property to determine whether there was a value in the equity of redemption. They did not redeem however.

The sureties now claim that the amount of the mortgage indebtedness and the valuation of the property to be applied to it should be as of the expiration of the first sixty days, while the bank claims they should be as Nov. 3 following, a difference of some hundred and twenty days.

We think the principles last above stated as to the rights of sureties, are applicable to this claim made by them. The bank was under no obligation to the sureties to begin suits against the company on the notes, or to press the suits to judgment at the return term if begun. *Eaton* v. *Waite,* 66 Maine, 221; *Berry* v. *Pullen,* 69 Maine, 101; *Thorn* v. *Pinkham,* 84 Maine, 101. By parity of reasoning, the bank was under no obligation to the sureties to begin foreclosure of its mortgages immediately upon default, or, if begun, to refuse more than the statutory time for redemption. If the interest was accumulating and the property deteriorating, the sureties had their preventive remedy. They could have paid the mortgage debts and so have saved interest and loss. Without doing so they cannot be heard to complain that the bank did not promptly and rigorously enforce its rights against the principal and the property.

It is not a case of a variation of the contract which the sureties had guaranteed. There was no binding agreement for a consideration for an extension of the time of payment of the indebtedness. The bank could still have prosecuted the suits on the notes to judgment, execution and levy. There was only a voluntary waiver of forfeiture for a limited time. No rights of the sureties were impaired thereby. Their loss, if any, was the result of their own delay in enforcing their own rights of payment and subrogation.

6. The sureties complain that the bank took possession of the mortgaged property abruptly without giving any notice of its intention to do so, and thereby abruptly stopped a going concern, subjecting it to a loss it would not have sustained had notice been given that possession would be taken if payment was not made. Since there was nothing in the mortgages, and no evidence of any agreement, to the contrary, the bank was under no legal obligation to give any notice of an intention to take possession whatever loss it might thereby cause the company or its sureties. Here again the sureties have no legal cause for complaint. As in the other cases, they could have paid the mortgage indebtedness and prevented the loss.

7. It remains to ascertain the amount of the various mortgage notes and other mortgage indebtedness on Nov. 3, 1909, when the bank's title to the mortgaged property became absolute; to ascertain what the bank had received for mortgaged property sold before that date; to ascertain the fair market value at that date of the mortgaged property then remaining unsold; to ascertain the amount collected by the bank from the book accounts and other assets of the company; to ascertain the value of such mortgaged property, if any, as was lost through the bank's fault after taking possession and before forfeiture; to ascertain what amount should be credited the bank for care of the property during that time, watchman, insurance, etc., and for sums necessarily paid to remove prior liens and encumbrances; to compute interest allowances either way; to ascertain what balance, if any, is applicable, as of Nov. 3, 1909, to the notes in suit signed by the sureties after payment of all the other indebted-

ness secured by the mortgages; and to ascertain how that balance should be distributed for the relief of the several sureties.

The parties introduced much and conflicting evidence upon these various questions, and now ask the Law Court to answer them. We must decline the task. The Law Court was not established to act as auditor, master in chancery, or accountant. While the Law Court may properly be called upon to review the work of such officers as to any disputed items, it cannot be required to take their place. As constituted, the Law Court cannot do such work efficiently or satisfactorily. The cases are therefore remitted to the court at nisi prius for the appointment of one or more suitable persons as auditors and masters to perform the work above indicated in accordance with this opinion, and such other work as may be necessary to furnish data for the determination of the issues between the parties and make return of their findings to the court.

*So ordered.*